RIGGS *v.* PENNSYLVANIA & N. E. R. Co. and others.

*(Circuit Court, D. New Jersey.* June 12, 1883.)

1. RAILROAD BONDS— VALIDITY — ISSUE BY, TRUSTEE — PURCHASER PUT ON INQUIRY.

Where the bonds of a railroad corporation, secured by mortgage, are signed and issued by a trustee, whose duty, it usually would be considered, was to act for the bondholders in enforcing payments to them, and to bring suit against the corporation for covenants broken, and not necessarily to include the power to place upon the market the bonds for sale, and the bonds are sold for a very small per cent. of the face value, the purchaser is put upon inquiry in regard to the regularity or validity of their issue.

2. SAME—SUPPRESSION OF EVIDENCE—EFFECT OF.

Where a minute-book, offered in evidence to prove the due organization of a corporation, and the regularity of an issue of its bonds, has been traced into the hands of its alleged officers, and its whereabouts thereafter unexplained, its suppression leads to a grave suspicion that it has been concealed on account of the evidence which its contents revealed of the legality of the organization and the validity of the bonds.

3. SAME—BILL DISMISSED.

As the evidence does not establish satisfactorily the organization of the railroad corporation at the time of the issuance of the bonds, or the existence of the mortgage securing the same, prayed to be made a prior lien in this case on the property of the corporation, the relief asked must be denied.

On Bill, etc.

*F. C. Lowthorp, Jr.*, for complainant.

*John Linn*, for defendants.

NIXON, J. The bill of complaint was filed in the above case to compel the defendants to record a mortgage, which, it is alleged, had been executed under the name of the South Mountain & Boston Railroad Company to secure the payment of certain bonds that had come to the complainant's hands by purchase. Its chief allegations are:

That on the thirteenth of March, 1873, the South Mountain & Boston Railroad Company was incorporated by an act of the legislature of the state of New Jersey; that the company was duly organized by the election of officers; that a large tract of land in the counties of Warren and Sussex, through which the road was to run, was acquired; that, in order to raise money to aid in the construction and equipment of the road, the company, on or about the first of October, 1878, at their office in Branchville, in the county of Sussex, executed and issued under its seal, by authority of law, to one Joseph Hague, trustee, 125 bonds of the denomination or par value of $1,000 each, whereby the company promised to pay to said Joseph Hague, or bearer, the sum of $1,000, on or before November 1, 1888, with interest at the rate of 6 per cent. per annum, payable semi-annually; that in order to secure the payment of said bonds and interest the company executed and delivered to Hague, as trustee, a first mortgage upon all its line of railroad, franchises, rights, and property, real and personal, then owned, or that might thereafter be acquired; that the company declared and asserted that said bonds were secured by a first mortgage upon all the property of the said company, and which was duly recorded in the office of the clerks of the counties of Warren and Sussex, when in fact such representations were false and fraudulent, and the same was never recorded; that after the issue and delivery of the said bonds to Hague, he negotiated a portion of the same, and that the complainant became the lawful owner and holder of four, numbered respectively 52, 53, 54, and 55, of the denomination or par value of $1,000; that on the second of March, 1880, the legislature of New Jersey passed an act authorizing all railroad companies to change their corporate names, under the provisions of which the said the South Mountain & Boston Railroad Company was changed into the Pennsylvania & New England Railroad Company; that the corporation, under its new name, on the first of July, 1880, executed and delivered to the other defendants, William H. Gatzmer and George M. Wright, as trustees, 600 coupon bonds, of the denomination or par value of $1,000 each, amounting in the aggregate to $600,-000, which said bonds, by the terms thereof, became due and payable to the said trustees, or bearer, on or before July 1, 1910, with interest at 6 per cent., payable semi-annually; that to secure the payment thereof the company executed and delivered to said trustees a mortgage upon all its line of railroad, as located and being constructed in New Jersey, from a point of connection with the Pennsylvania & New England Railroad Company (Pennsylvania Division) at the Pennsylvania state line in the Delaware river, a short distance below the Delaware Water Gap, and extending through the counties of

Warren and Sussex to the New York state line, east of Deckertown, in the Wallkill River district, with all the property and appurtenances then belonging to, or which might thereafter be acquired by, the said corporation; and that said mortgage had been left with the register of the county of Sussex for the purpose of being recorded.

The prayer is—

That the corporation may be decreed to record the first-recited mortgage and that the same be held as the first lien upon the mortgaged premises; and that the last-recited mortgage may be decreed to be a second incumbrance, and its lien subsequent to the first executed mortgage.

The joint and several answer of the defendants denies—

That the South Mountain & Boston Railroad Company ever issued any bonds as set forth in the bill of complaint, or executed any mortgage for securing the payment of the same; but claims that on the first of July, 1880, a mortgage was made and executed by the Pennsylvania & New England Railroad Company to secure the payment of $600,000, the amount of bonds issued by the said company; that the same has been duly recorded; and that the bonds have been negotiated and have passed into the hands of third parties on the faith of the security, guarantied by the said mortgage.

The following facts appear in the case:

The legislature of New Jersey passed an act, approved March 13, 1873, incorporating the South Mountain & Boston Railroad Company. In the eighteenth section of said act it was provided that if the railroad should not be commenced within one year, and completed within five years, from the fourth of July next ensuing, (1878,) the act should be void. By a subsequent law, approved April 3, 1878, (P. L. 1878, p. 261,) it was enacted that any railroad company incorporated by any special act of the legislature, six miles or more of whose road had been built, and the time for the completion of which expired during the current year, should have the authority and power to finish its railroad within five years from the date of the passage of the act,—anything in their charters, or the supplements thereto, to the contrary notwithstanding. A further supplement was approved February 18, 1879, (P. L. 25,) in which authority was given to apply the extension for five years from that date to all companies, six miles or more of whose road had been built or graded, and the time for the completion of which had expired during the preceding year. A general act was also passed and approved March 2, 1880, (P. L. 68,) which empowered any railroad company, organized under the laws of the state, to change its corporate name, under the provisions of which the defendant corporation changed its name to the Pennsylvania & New England Railroad Company.

It is doubtful, from the evidence, whether the South Mountain & Boston Railroad Company was ever organized. Its organization is not admitted in the answer, and the only proof of the fact made by the complainant is that one William H. Bell and Marshall Hunt, re-

spectively, performed some acts as president and secretary of such corporation. Joseph Hague says he thinks he was once informed by somebody that he was elected a director of the company, but that he never acted as director, and never heard of more than one meeting of any board of directors, which was at the house of Mr. Bell, in Sussex county, and the only persons present there were Marshall Hunt, secretary, and a gentleman named John G. Haney. He understood the company was organized at that meeting, but knows nothing of his own knowledge. He had a verbal notice from Mr. Bell that he had been elected treasurer, but he was never asked by anybody to qualify, or to give bonds, or to receive money, or to perform any duties as such officer. He was requested by Mr. Bell to take the trusteeship for the issue of bonds to the amount of $125,-000, but does not know of any action of the company authorizing such request, or the issue of the bonds. Although he signed a private certificate on each of the bonds that a first mortgage had been executed and delivered to him to secure their payment, he never saw any mortgage,—does not know that one was ever executed,—but was told by Bell that Hunt, the secretary, would attend to the matter of recording one. It is through him as trustee that the complainant claims title to the four bonds, to secure which he wants a mortgage recorded, and he was made a witness to prove the *bona fides* of the complainant's ownership. His statement of the origin of the bonds is so novel that it is worth repeating in his own words. (Four bonds of the South Mountain & Boston Railroad Company, purporting to be of the loan of $125,000, and the denomination of $1,000 each, numbered, respectively, 52, 53, 54, and 55 being shown the witness.) He says:

"These bonds are of the issue I have spoken of. That is my signature, indorsed on the back. * * * I accepted that trust. These indorsements on the bonds are in pursuance of that acceptance of trustee. These bonds were sold by me; I became possessed of them by the acceptance of the powers of the trusteeship of the loan. The bonds were brought to me by William H. Bell, president, to my office in No. 6 Gold street, New York city, to be signed by me; he stating that Mr. Leslie, of Philadelphia, and the secretary would wait for me at a room in the Astor House. As soon as I could get through signing the bonds Mr. Bell requested me to come to the Astor House and we would there seal them. I went to the Astor House, and after discussion between Mr. Bell and Mr. Leslie, as to the legality of executing the bonds in the state of New York, they were there sealed, folded, and the whole of the bonds were handed to me, with the seal. Mr. Bell requested me to give 25 bonds to Mr. Leslie. I began to count them, and Mr. Leslie asked Mr. Bell to step into the hall. They came back, and Mr. Bell requested me to give 50 bonds to Mr. Leslie, instead of 25. I did so, and that was the end of it."

He further states that he sold the four bonds exhibited in the case through a broker to the complainant, whom he casually knew; that he cannot remember the name of the broker who made the sale; that he was present when the bonds were delivered to the purchaser, but made no special representations to him in regard to them. On cross-examination he added that he was requested by Mr. Bell to act as trustee a few days only before issuing the bonds—long enough before to get them printed; that he never saw and knows nothing about the conditions of the mortgage which was to secure the bonds; that the whole issue of bonds was signed by him at the one time—a few days after October 1, 1878; that he supposed his powers as trustee were to negotiate the bonds and apply the money to the treasury of the company; that no one told him so, but he inferred it from the possession of the bonds; that he never received any notification from the company what his powers were, and never heard of any resolution passed by the company on the subject; that he received $150 from the complainants for the four bonds sold to him, and kept the money, as the company never asked him to account. The sale took place in July or August, 1880.

William O. Leslie substantially corroborates the testimony of Hague. He was present at the Astor House in New York, in October, 1878, when the bonds were signed by the trustee and sealed. Fifty of them were given to him to negotiate,—Mr. Bell and Mr. Hague requesting it. He never heard of any resolution of the board of directors authorizing their issue or negotiation. He pledged to one party two or three of them, as security for the loan of $100, which sum he owed for printing the bonds. He hypothecated a few others for another small loan, and never knew what became of them. He had most of the 50 in his possession still, and any one who wanted them could have them, as they were worthless. The negotiation of the bonds fell through as soon as it was questioned whether the company had any legal existence when they were issued.

From this consideration of the evidence, I should not hesitate to hold that no sufficient proof had been made of the organization of the company, if it were not for another circumstance which happened during the progress of the case, and which calls for serious comment and observation.

It appears from the testimony of the complainant's solicitor (Mr. Lowthorp) that a decree pro con. was entered for want of an answer, and an order made upon the complainant to proceed ex parte to establish the allegations of his bill of complaint; that the former secre-

tary of the company (Hunt) was subpœnaed as a witness, and was examined, and the minute-book of the South Mountain & Boston Railroad Company, in his custody, was marked an exhibit in the case; that the defendants afterwards opened the decree and obtained leave to answer, and that an order was entered that the testimony should be taken *de novo*, that the defendants might have the opportunity of cross-examination; that, before tho proofs were in, the said secretary, Hunt, died and the minute-book disappeared; and although it has been traced directly into the hands of the officers of the defendant corporation, no one has been found who was able to tell its whereabouts.   There is enough in the circumstances of the case to lead to a grave suspicion that the defendant has concealed the minute-book on account of the evidence which its contents revealed of the due organization of the company and the regular issue of the bonds in controversy.   If I was obliged to put the ultimate determination of the suit upon these questions, I should draw unfavorable inferences from the conduct of the officials of the company in regard to the book, and should be quite willing to assume that it had been put out of the way because it contained proof of material facts which the defendant corporation was anxious to suppress.

But it may be conceded that the company was duly organized, and the loan authorized, and yet the complainant may not be entitled to the relief prayed for.   There is no proof here, and I do not understand that it is claimed, that the minute-book of the corporation, if produced, would contain any proof that the trustee, Hague, had authority to sell these bonds.   The usual duties of a trustee, in such cases, are to act for the bondholders in enforcing payments due to them, and to bring suit against the company for covenants broken. It does not necessarily include the power to place upon the market the bonds for sale; and when such authority is exercised by the trustee, it ought to put the purchaser upon inquiry; and when to that is added the further fact that bonds of the par value of $4,000 are sold for the inconsiderable sum of $150, a grave doubt is suggested whether the inadequacy of price should not, of itself, have warned the complainant that something was wrong, and that he should make some inquiry in regard to the regularity or validity of their issue.   But, in my view of the case, it is not necessary to determine whether the complainant is or is not a *bona fide* holder of the bonds. If shown conclusively that he was, it would not follow that the present action could be maintained.

The specific relief asked for in the bill of complaint is (1) a decree

for the record of a mortgage which the evidence shows has no existence, and which has been put out of the way,—not, perhaps, with any fraudulent intent, but because the makers of it had concluded that it had been executed without authority of law; and (2) to make the same, when recorded, a first mortgage, as against another incumbrance, which had been given by the defendant corporation to secure the payment of bonds of the par value of $600,000.

There are two difficulties in granting such relief: (1) On account of the impossibility of recording a paper which does not exist, and which was probably destroyed before the complainant's title to the bonds accrued; and (2) because the equally meritorious bondholders of the lands of the last-recited mortgage are not parties to these proceedings, and it would be inequitable to make any decree whereby the validity of their security would be impaired, if not destroyed, without notice and without the opportunity of defending their rights and interests.

A decree must be entered denying the relief asked for, and dismissing the bill of complaint, but, under the circumstances, without costs.